**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TYLER HILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 15 C 368** |
| | ) | |
| | ) | |
| **BRASS EAGLE, INC., JT SPORTS, LLC,** | ) | |
| **and KEE ACTION SPORTS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

During a paintball game, one teenage boy shot another, Tyler Hill, in the eye with

a paintball. Though Hill had been wearing a protective facemask that day, he removed

the mask before being shot, allegedly because the mask had fogged up and limited his

vision. Hill has sued the manufacturers of the mask—Brass Eagle, Inc., JT Sports, LLC,

and KEE Action Sports, LLC (defendants)—asserting claims for products liability (count

one), breach of implied warranty of merchantability (count two), breach of implied

warranty of fitness (count three), and breach of express warranty (count four).

Defendants have moved for sanctions against Hill for spoliation of evidence on the part

of Hill's expert witness, Jason Babcock. They have also moved to exclude Babcock's

testimony and for summary judgment. For the reasons discussed below, the Court

denies defendants' motions.

**Background**

Hill was fourteen years old on September 18, 2009, the day of his eye injury.

That afternoon, he and nine other fourteen and fifteen year old boys were playing paintball in a vacant field in Antioch, Illinois. At dusk, while the boys were still playing, Hill declared himself out of the game after being shot by a paintball in his midsection. He says that when he stood up in the field, he could not see his surroundings because the protective facemask he was wearing had become fogged over. Hill removed the mask from his face, and another player subsequently shot a paintball that struck Hill and injured his left eye.

Hill's father had purchased the JT Entry Goggle Soft Stream mask as a gift for Hill. The mask's packaging stated that the lens on the mask's goggles was "fog resistant." Though Hill received the mask and other paintball items in a cardboard gift box, his father told him the items were new, and they did not look used. The manufacturer's instructions were not included in the gift box Hill received, but defendants maintain that all new JT Sports products are accompanied by instructions warning that fogging may occur and that users should never remove goggles during play even if fogging does occur. Despite not having read the instructions, Hill admits that he did not expect the mask to be fog-proof on the day he was injured. He had used the mask in a paintball game once before, several weeks prior to the date of his injury. In that prior game and throughout the day of his injury, Hill had attempted to clear the fogging on his mask by sticking a finger inside the mask and wiping the goggles. But he says that by the time of his injury, the wiping method was no longer effective at clearing the fog to allow him to see. All of the other boys who were playing with Hill on the day of his injury testified that their masks were also fogging that day.

Hill, by his mother, initially filed suit in state court, alleging negligence against the

boy who shot him and negligent supervision against the boy's father. Hill later amended that initial complaint to add claims against defendants. After Hill reached a settlement agreement with the boy who shot him and his father, he voluntarily dismissed the case against the remaining defendants in November 2013. Hill then filed this action, again in state court, against the current defendants in September 2014. Defendants removed the case to federal court based on diversity of citizenship.

Hill's counsel retained Jason Babcock, a chemist, to examine the mask. Babcock explains in his expert report that single-pane polycarbonate lenses, the type of lens used in the mask Hill was wearing, are intrinsically hydrophobic and will thus cause condensed moisture to bead up and distort light transmission through the lens, creating a fogging effect. According to Babcock, manufacturers of paintball mask lenses typically treat the masks with anti-fog coatings—by dipping the lenses in coating solutions—to make the lens surfaces hydrophilic, in other words, more wettable. He conducted tests on a number of paintball masks, including Hill's mask, to assess their anti-fog properties. At the time Babcock received Hill's mask to begin testing, it had paint, debris, and dirt on it.

One of the methods Babcock used to test the masks came from JT Sports' own Policies and Procedures manual, which included a test procedure to evaluate the anti-fog properties of a lens. That test requires washing the lens and refreshing the anti-fog coating with an aftermarket product, conditioning the lens at 40 degrees Fahrenheit for a minimum of four hours, removing the lens, fogging it with one's breath or with a garment steamer, and recording the time for the fog to dissipate. A lens passes the test if no fog forms or if the fog remains on the lens for no longer than three seconds.

Babcock conducted this test for eight paintball masks—five masks with single-paned lenses and three masks with dual-paned lenses.  The single-paned lenses included Hill's mask, two other JT Sports masks that were used by other boys at the paintball game, a new JT Sports mask that contained a fan system to reduce fogging, and a new U.S. Army Ranger Performance Goggle, purchased from a sporting goods store.  Of that group, only the U.S. Army Ranger mask passed the test.  Two of the masks with dual-paned lenses were JT masks, only one of which passed the test.  Another company manufactured the other mask with a dual-paned lens, and that mask passed. From this testing, Babcock concluded that double-pane lenses generally fare better than single-pane lenses and that even new, single-pane JT Sports lenses can fail the company's own anti-fog test.

Babcock also conducted a field test with the same masks.  He chose a day with weather conditions similar to those on the day of Hill's injury and had test subjects wear the masks during outdoor physical activity, noting the time when the inner lens began to fog.  Babcock found that none of the new masks fogged during the ten-minute test duration, but the portion of the single-pane JT Sports mask that he left unwashed did fog.  Based on the field test and the test outlined in the JT Sports Policies and Procedures Manual, Babcock determined that other mask lens designs and masks made by other manufacturers were more effective at preventing fog formation than the mask Hill had used.  The mask that Hill used, Babcock concluded, does not sufficiently prevent fogging under certain conditions during outdoor activity and is thus not suitable for its intended use.

After the submission of his expert report and Hill's voluntary dismissal of the prior

state law case, but before Hill filed this action, Babcock conducted additional testing, and Hill's counsel provided the results and conclusions from such testing to defendants' counsel.  In this round of testing, Babcock examined the surfaces of five different JT Sports mask lenses (four used by Hill and other boys at the paintball game and one newly purchased), as well as a U.S. Army Ranger Performance Goggle.  Using methods of elemental analysis—namely, energy dispersive x-ray spectroscopy (EDX) and Fourier transform infrared spectroscopy (FTIR)—Babcock found no evidence that any of the JT Sports lenses contained a polysiloxane coating, the anti-fog coating that JT Sports claimed it applied to its masks' lenses.  The EDX and FTIR testing did indicate, however, that the U.S. Army Ranger mask contained a polysiloxane coating.  In this round of testing, Babcock also conducted a qualitative comparison of the contact angle formed when applying a small droplet of water to the lenses, and he found that the JT Sports lenses were less hydrophilic (and thus less resistant to fogging), as water droplets tended to bead up more on those lenses than the droplet on the U.S. Army Ranger lens.  Finally, Babcock again conducted the anti-fog test from the JT Sports Policies and Procedures manual, and he noted the superior performance of the U.S. Army Ranger lens in comparison to the JT Sports lenses.  From these subsequent tests, Babcock concluded that the mask Hill wore on the day of his injury did not have an anti-fog coating and did not have one at the time it was purchased.

To conduct this second round of testing, Babcock cut out sections of material from the lens of the mask.  Although Babcock notified Hill's counsel before cutting the lens, neither Babcock nor Hill's counsel notified defendants or their experts that the mask would be cut.  Defendants contend that the mask is no longer in the same

condition as when Babcock originally took possession of it and that its original condition can never be restored.  As a result, they maintain, one can no longer look through the mask to determine what a wearer of the mask could see, preventing defendants' experts from conducting field tests using the mask and depriving jurors of the opportunity to try on the mask in its original condition to see how the mask looked fogged and unfogged. According to defendants, Babcock's destructive testing of the mask, conducted with knowledge of his duty to preserve evidence, constitutes spoliation of evidence.  They have thus moved for sanctions, including dismissal of Hill's case, exclusion of Babcock's testimony and all testimony regarding the condition of the mask after the incident, and an adverse instruction regarding Hill's failure to produce evidence.

Even if the Court denies defendants' motion for sanctions, defendants contend that Babcock's testimony should be excluded because (1) he lacks the proper experience and qualifications to offer an opinion on the adequacy of a paintball mask's design and (2) the opinions he intends to offer in this case are not based on a reliable methodology.  Babcock admits that he is not an expert in protective headgear design, paintball, lens design, anti-fog coatings, or anti-fog lenses.  Defendants argue that his lack of expertise in these areas renders him unqualified to offer expert testimony about the design of the subject mask.  Despite his lack of experience in those particular subject areas, Babcock does have a Ph.D. in chemistry, and he has over thirteen years of experience in developing new products and researching polymers, metals, ceramics, and other inorganic and organic materials.  Hill contends that this experience qualifies Babcock to offer his opinions in this case regarding the scientific principles governing the fogging effect on the lenses of protective masks, as well as the effectiveness of the

anti-fogging properties of the mask and the masks of JT Sports' competitors.

In addition to questioning Babcock's qualifications, defendants challenge the reliability of the methods he used to form his opinions.  They argue that his conclusions have not been tested by reliable methods and are not independently supported by peer review or peer-reviewed literature, and that they are instead based upon his own speculation.  In particular, they note that his opinions concerning the safety of the mask at issue when it was placed on the market are unreliable because by the time Babcock tested the mask, it was a number of years old and was covered with paint and dirt. They also fault Babcock for conducting his field experiment of the masks without recreating the exact conditions from the day Hill was injured.  Finally, they attack his conclusion that the mask lacked an anti-fog coating, because the mask did, they insist, contain a polyurethane coating, which can limit fogging by preventing scratching of the lens.  Hill counters that Babcock did indeed test his conclusions and that they were, in fact, largely based on extensive and reliable laboratory and field testing.  Regarding the failure to test the anti-fog properties of polyurethane, Babcock says that he based his testing of the mask's anti-fog coating on representations from defendants that their masks were coated with polysiloxane.  Thus, he says he was justified in only testing for that particular anti-fog coating at the time.

According to defendants, if the Court bars Babcock's testimony, it must also grant their motion for summary judgment, because Hill will be left without any expert testimony to prove that the mask was defective or that the defect caused his injury.  But even if Babcock is permitted to offer his testimony, defendants maintain that summary judgment is appropriate because Hill cannot show—even with the benefit of Babcock's

opinions—that his mask was unreasonably dangerous or that the mask's alleged defect was a proximate cause of his eye injury. Hill maintains that he has raised a genuine issue of fact for the jury about whether the mask's tendency to fog made it unreasonably dangerous and about whether the type of injury he suffered was reasonably foreseeable, and thus proximately caused by the mask's alleged defect.

## Discussion

### A.    Defendants' motion for sanctions

The parties appear to agree that state law governs the issue of sanctions for spoliation of evidence in a diversity case; both sides rely on Illinois case law and Illinois Supreme Court Rule 219 in their arguments. The Court notes at the outset, though, that some other courts have applied federal law in diversity cases to determine whether sanctions are appropriate for alleged spoliation of evidence. *See, e.g.*, *Kucik v. Yamaha Motor Corp., U.S.A.*, No. 2:08-CV-161-TS, 2009 WL 5200537, at *2 (N.D. Ind. Dec. 23, 2009) (citing *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672 (7th Cir. 2008), in concluding that federal law applied to plaintiff's request for sanctions for destruction of evidence). As the Court concludes at the end of this section, the outcome of the spoliation inquiry would be the same under either federal or state law, so the Court will analyze the issue under Illinois law as both sides have done in their briefs. *Cf. J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005) (applying state spoliation law where parties agreed state law applied in context of independent tort claim for spoliation).

The Illinois Supreme Court has determined that courts may impose sanctions for the destructive testing of evidence, even if the testing occurs prior to litigation and

before the entry of any protective order. *See Shimanovsky v. Gen. Motors Corp.*, 181 Ill. 2d 112, 122, 692 N.E.2d 286, 290 (1998). Although destructive testing may have value and may actually be difficult to avoid in certain cases, "such testing must be authorized in the sound discretion of the trial court and be permitted only when the rights of the opposing litigant are not unduly prejudiced." *Id.* (internal quotation marks omitted). It is undisputed that Babcock engaged in destructive testing of an important piece of evidence—namely, the allegedly defective product in a products liability case—and that neither he nor Hill or Hill's counsel sought a court's or defendants' permission to conduct such testing. The Court would thus be within its discretion to conclude that Babcock's actions, of which Hill's counsel had knowledge, constituted "unreasonable noncompliance with discovery rules." *Id.* at 123, 692 N.E.2d at 290.

Hill contends that *Shimanovsky* does not apply because that case involved destructive testing of evidence prior to the filing of a lawsuit, whereas Babcock's destructive testing occurred during litigation. The Court disagrees. First, despite Hill's assertion, Babcock's destructive testing *did* occur prior to the filing of the present lawsuit (though after the previous lawsuit had been filed and dismissed), while no case was pending between the parties, just like the testing in *Shimanovsky*. Second, nothing in the court's opinion in *Shimanovsky* suggests that unreasonable destruction of evidence becomes permissible once litigation begins. Rather, the court in *Shimanovsky* affirmed its rule that such testing must be authorized by the trial court, a rule which expressly addresses testing conducted during litigation. *Shimanovsky* thus governs the issue of sanctions for spoliation in this case.

But although the court in *Shimanovsky* ruled that a trial court has authority to

impose sanctions for the unreasonable destructive testing of evidence, the court also noted that severe sanctions, such as those that result in a case's dismissal, should be imposed only in "cases where the party's actions show a deliberate, contumacious or unwarranted disregard of the court's authority." *Id.* at 123, 692 N.E.2d at 291. Even if a party has committed a sanctionable wrong, courts must consider the following factors to determine what sanction, if any, to apply:

> (1) the surprise to the adverse party; (2) the prejudicial effect of the proffered testimony or evidence; (3) the nature of the testimony or evidence; (4) the diligence of the adverse party in seeking discovery; (5) the timeliness of the adverse party's objection to the testimony or evidence; and (6) the good faith of the party offering the testimony or evidence.

*Id.* at 124, 692 N.E.2d at 291.

The majority of the factors in this case weigh against the imposition of sanctions. Although defendants may indeed have been surprised to find that portions of the mask had been cut out, and they appear to have sought discovery in a diligent fashion, the remaining factors cut against their sanctions request. The nature of the spoliated evidence in this particular case limits the prejudicial effect of Babcock's destructive testing. Hill asserts a claim for defective design, not for a manufacturing defect, and thus defendants' access to the exact mask Hill wore is not essential to their defense. As in *Shimanovsky*, defendants possess "all the information and data regarding the original design and production of the [allegedly defect product]," and they can use a new version of the mask if they wish to demonstrate to the jury how the mask operates when fogged and unfogged. In addition, defendants have not acted in a timely fashion in objecting to the spoliation of the evidence. Hill represents that defendants first raised their objection to the destructive testing in their motion for sanctions, a year and a half after the testing

occurred, and defendants fail to respond to that contention in their reply brief. Finally, and significantly, the record does not disclose any bad faith on the part of Hill or Babcock in conducting the destructive testing. It appears that Babcock cut portions of the lens as part of a good faith effort to analyze its chemical properties, not in attempt to sabotage defendants' own testing opportunities. The failure to show that Hill or Babcock was operating in bad faith would prevent the imposition of sanctions even if the Court applied federal law to the spoliation issue. *See Trask-Morton*, 534 F.3d at 681 ("[A] showing [of bad faith] is a prerequisite to imposing sanctions for the destruction of evidence."). Thus the Court declines to impose sanctions for Babcock's destructive testing of Hill's mask.

**B.      Defendants' motion to exclude Babcock's testimony**

The admissibility of evidence in diversity cases is governed by federal law, including the Federal Rules of Evidence. *In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 701 F.2d 1189, 1193 (7th Cir. 1983). Under federal law, an expert witness who is qualified as an expert "by knowledge, experience, training, or education" may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993), the district court plays the role of gatekeeper, determining at the outset

whether an expert's proposed testimony will be relevant, reliable, and grounded in fact. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). The expert's proponent bears the burden of establishing, by a preponderance of the evidence, that the expert's testimony is admissible. *United States v. Saunders*, No. 13-3863, 2016 WL 3213039, at *4 (7th Cir. June 10, 2016).

### 1. Qualifications

Defendants contend that although Babcock may be a capable chemist, his chemistry background does not qualify him to testify about the design of a paintball mask or about fog-resistant coating. They note that he has no experience in paintball or the design of protective headgear, paintball masks, or lenses. Just as a heart surgeon lacks the knowledge to offer a reliable opinion about spine surgery, defendants argue, a chemist who lacks experience in paintball mask design is unqualified to offer an opinion about the safety of the design of Hill's paintball mask. *See Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) ("Just as a qualified and board certified heart surgeon does not possess sufficient knowledge of orthopaedic medicine to render an expert opinion on spine surgery, likewise we agree with the trial court's ruling that a mechanical engineer . . . lacks qualifications to give expert testimony about [manufacturing] plant reconfiguration.").

The Court's role, however, is not to ask whether Babcock is qualified in general to testify about paintball mask design, but to look at "each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). In this case, Babcock's training as a chemist and his experience in product development qualify him to provide the specific

opinions he intends to offer. His conclusion that single pane polycarbonate lenses are hydrophobic and thus prone to fogging is based on basic chemistry, as well as a literature review on the subject—a review that, as a scientist, he was more than capable of conducting. His conclusion that certain JT Sports masks were more prone to fogging than other masks is a conclusion about the chemical properties of the masks and is based on testing that he was qualified to administer. And his conclusion that the mask Hill wore on the day of his injury lacked a particular anti-fog coating is based on a chemical analysis of the mask lenses that is squarely within the purview of a chemist's expertise. Babcock does not purport to be offering opinions about the rules of paintball or the non-fogging aspects of paintball gear design, subjects about which he admittedly lacks expertise. To the extent Babcock's lack of direct experience with paintball and paintball gear design undermines his credibility as a witness, defendants can press that point on cross-examination. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (discussing jury's "essential role as the arbiter of the weight and credibility of expert testimony").

### 2. Reliability

Defendants argue that even if Babcock were qualified to offer expert testimony in this case, his opinions are unreliable because they are not based on testable methods and are not independently supported by peer review or by peer-reviewed literature. It is true that whether a theory or technique can be (or has been) tested and whether a theory or technique has been subject to peer review and publication are factors for courts to consider in determining the reliability of a proposed expert's methods. *See Daubert*, 509 U.S. at 593. But "lack of peer review will rarely, if ever, be the single

dispositive factor that determines the reliability of expert testimony." *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000). Rather, the determination of whether an expert's methods are reliable "is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case." *Id.*

In this case, defendants have not provided reason to believe that there would be peer-reviewed literature on the narrow subjects about which Babcock is offering an opinion. Thus the absence of literature does not suggest that Babcock has ventured beyond the realm of accepted scientific practice in forming his conclusions. And contrary to defendants' assertions regarding testability, Babcock's opinions are indeed testable because they are based on tests he, himself, conducted. Those tests include an anti-fog test drawn from JT Sports' own Policies and Procedures Manual, a field test of the mask and other identified masks, a qualitative comparison of contact angles formed when droplets of water were applied to the lenses of identified masks, and the EDX and FTIR elemental analyses of the same masks. If defendants dispute the results of such tests, they may conduct their own versions of the tests and attempt to correct any flaws in the methodology they observe. Apart from pointing out specific flaws in the ways Babcock conducted his tests, defendants do not appear to dispute the general reliability of field testing, qualitative comparisons of lenses' contact angles, EDX and FTIR, or their own anti-fog test.[1]

---

[1] Defendants do argue in their reply brief, but not in their initial brief, that the JT Sports anti-fog test is a quality control test used to evaluate only *new* lenses, which defendants say that Babcock himself admitted. Babcock, however, only admitted during his deposition that quality control tests are usually conducted on new products, and he denied having seen anywhere that the JT Sports anti-fog test was intended as a test only for new products. In any event, "it is well-established that arguments raised for the

As for the methodological flaws defendants say they have identified, they do not undermine the reliability of Babcock's methods. To the extent the alleged flaws are valid, they speak more to the weight his conclusions should be afforded. In particular, defendants attack the following purported flaws in Babcock's testing: (1) failing to explain how he reduced the temperature to 40 degrees Fahrenheit to conduct his anti-fog testing, (2) conducting his field test without recreating the exact conditions that existed on the day of Hill's injury, and (3) drawing conclusions about the design of a mask years after it had entered the market and after it had been covered with paint, dirt, and debris and had its surface wiped numerous times. None of these alleged flaws so undermines Babcock's methodology that his testimony is appropriately excluded. Defendants have not even explained, for example, why it is necessary to know how Babcock reduced the temperature to 40 degrees to conduct his test. As for the conditions of Babcock's field test, Babcock testified that he attempted to recreate the conditions from the day of the injury. To the extent Babcock failed in that attempt, defendants can argue that the conclusions drawn from that test should be given less weight. Finally, with regard to the state of the mask at the time of testing, Babcock has attempted to address that concern by also testing the anti-fog coatings of new JT Sports masks. In addition, whether Babcock is justified in drawing his conclusion from a test of an old mask in a used condition is a question for the jury, not for the Court, to decide. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

---

first time in the reply brief are waived." *Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011).

Finally, defendants attack Babcock's conclusion that the mask lacked any anti-fog coating. They assert that the mask had a polyurethane coating, which is used to make masks fog-resistant by preventing scratching of the lens, but that Babcock did not realize that polyurethane was used for that purpose when he conducted his test. Babcock admits that he did not realize that mask manufacturers used polyurethane as an anti-fog coating and says that he only tested for the presence of polysiloxane because he knew that that coating had anti-fog properties and because defendants represented that its masks contained polysiloxane. Based on this new information, Babcock says he would revise his report to say that the mask did not contain a polysiloxane coating, but he also maintains that polyurethane is less hydrophilic (and thus less fog-resistant) than polysiloxane and that polysiloxane is thus a preferable coating for preventing fogging. This conclusion is supported by his own basic chemistry knowledge as the well as the testing he performed, which showed greater resistance to fogging among the masks coated with polysiloxane. Thus even this updated conclusion is based on reliable methodology, and defendants will be free to attack on cross-examination any "shakiness" of his testimony resulting from his prior confusion about polyurethane's anti-fogging purpose.

### 3. Relevance

In the course of Babcock's expert report, he does not definitively conclude that the mask was "unreasonably dangerous." Rather, he opines that the material of which the mask's lens was composed renders the mask prone to fogging, that the mask did not contain the anti-fog coating it was purported to contain, and that other masks did contain that coating and were less prone to fogging. During his deposition, Babcock

would only say that the mask's propensity to fog, when compared with other masks, "could have been" unreasonably dangerous. *See* Babcock Dep., Ex. J to Defs.' Mots., at 110:14–22. According to defendants, Babcock's testimony should be excluded because his failure to offer an opinion on the ultimate issue of whether the mask was "unreasonably dangerous," and thus defectively designed, renders his testimony irrelevant. But the bar for relevance is not as high as defendants suggest. "[E]xpert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact." *Smith*, 215 F.3d at 720. Under this standard, there can be no doubt that Babcock's testimony is "relevant to evaluating a factual matter in the case." His opinion about the fogging potential of the mask and his comparison of alternative designs' anti-fogging properties is relevant to the jury's evaluation of whether the mask was unreasonably prone to fogging. Thus, although Babcock's testimony would be relevant even if it did not relate directly to the ultimate issue, it clearly does so in this case.

The fact that Babcock's testimony is relevant, however, does not necessarily mean that it is sufficient to support a finding that the mask was defectively designed. In products liability cases, such a conclusion generally does require the support of an expert opinion. *See Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821, 835, 557 N.E.2d 580, 589 (1990). But whether Babcock has offered enough expert testimony to permit a lay jury to conclude that the mask was defective is a question more appropriately considered as part of the summary judgment analysis, to which the Court now turns.

**C.    Defendants' motion for summary judgment**

Defendants argue that even if Babcock's expert testimony is admitted, the Court should grant summary judgment because Hill cannot meet the burden of proof for his design defect claim.  Summary judgment should be granted only when there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, courts must construe all facts in the light most favorable to the nonmoving party. *Williams v. Brooks*, 809 F.3d 936, 941 (7th Cir. 2016).

The parties do not dispute that Illinois' products liability law applies in this diversity case.  Under Illinois law, a plaintiff bringing a claim for strict liability based on a defect in the product bears the burden of establishing the following:

> (1) a condition of the product as a result of manufacturing or design, (2) that made the product unreasonably dangerous, (3) and that existed at the time the product left the defendant's control, and (4) an injury to the plaintiff, (5) that was proximately caused by the condition.

*Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 543, 901 N.E.2d 329, 345 (2008). Defendants maintain that Hill cannot meet his burden to prove that the mask was unreasonably dangerous when it left defendants' control or that any alleged defect was the proximate cause of his injury.

**1.    Unreasonable dangerousness**

Under Illinois, a plaintiff may demonstrate that a product was unreasonably dangerous by one of two methods:  the consumer-expectation method or the risk-utility method.  *Id.* at 548, 901 N.E.2d at 348.  Under the consumer-expectation method, a plaintiff can prove that a product is unreasonably dangerous by showing that it is "dangerous to an extent beyond that which would be contemplated by the ordinary

consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 254, 864 N.E.2d 249, 255 (2007). In particular, the plaintiff must show that the product is unreasonably dangerous "when put to a use that is reasonably foreseeable considering its nature and function." *Mikolajczyk*, 231 Ill. 2d at 554, 901 N.E.2d at 352. The plaintiff need not present evidence of ordinary consumer expectations, because "members of the jury may rely on their own experiences to determine what an ordinary consumer would expect." *Id.* The risk-utility test, on the other hand, looks at the question from a societal perspective, asking whether the benefits of the challenged product's design outweigh the risk of danger inherent in such designs. *Id.* at 527, 901 N.E.2d at 339.

The Court addresses the consumer-expectations test first. According to defendants, the mask cannot be considered unreasonably dangerous under this test because the ordinary consumer who purchases it would expect the mask to fog. Defendants point out that Hill himself expected his mask to fog because it had fogged when he had used it previously. And all of the other boys playing on the day of Hill's injury also had fogged masks; from this fact, defendants infer that those boys, too, expected their masks to fog. Even Babcock, defendants note, admitted that he was unaware of any paintball masks that were completely fog-proof under all conditions. Thus defendants contend that fogging is inherent in the use of any paintball masks currently on the market. They argue that this case, therefore, is exactly like *Lara v. Thoro-Matic Vacuum Systems, Inc.*, 194 Ill. App. 3d 781, 551 N.E.2d 390 (1990). In *Lara*, an Illinois court ruled that the risk of tripping over a vacuum cleaner's power cord is inherent in the use of an electric vacuum cleaner. *Id.* at 787, 551 N.E.2d at 394.

Thus the mere fact that a vacuum cleaner contained such a risk did not render it unreasonably dangerous, and the plaintiff who was injured when she tripped over the vacuum cleaner's cord could not recover. *Id.*

This case, however, is distinguishable from *Lara*. Although the risk of some fogging may be inherent in the use of a paintball mask, a reasonable jury could conclude from the evidence in this case that the *degree* of fogging in Hill's mask created a danger that went beyond what the ordinary paintball mask consumer would expect. Babcock's testing showed, for example, that the mask had a worse performance than other masks on anti-fog tests, failed JT Sports' own recommended anti-fog test, and lacked an effective anti-fog coating that other masks contained. In addition, Hill testified that his mask fogged to the point that he could no longer see. Viewing this evidence in the light most favorable to Hill, the Court concludes that a reasonable jury could find that an ordinary consumer would not expect a paintball mask—especially a paintball mask labeled "fog resistant"—to fog to the degree Hill's mask did and that the fogging was the result of the mask's design.

For these reasons, Hill has presented enough evidence to establish that the mask's design was unreasonably dangerous when it left defendants' control under the consumer-expectations method. Because a plaintiff may prove unreasonable dangerousness under either the consumer-expectations method or the risk-utility method, and because the evidence offered at trial would be similar under both methods, the Court need not engage in the full risk-utility analysis at this stage to determine that Hill has satisfied this element of his design defect claim.

**2.      Proximate cause**

A plaintiff asserting a strict liability claim for defective design of a product, like a plaintiff asserting a claim for negligence, must establish that the defendant proximately caused his injury. *Kleen v. Homak Mfg. Co.*, 321 Ill. App. 3d 639, 641, 749 N.E.2d 26, 29 (2001). "A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause." *Id.* Proximate cause is "ordinarily a question for the jury." *Id.* It becomes a question of law only where there are no material issues of fact or "only one conclusion is clearly evident." *Id.* Ultimately, proximate cause or "legal cause" is "essentially a question of foreseeability . . . ." *Lee v. Chicago Transit Auth.*, 152 Ill. 2d 432, 456, 605 N.E.2d 493, 503 (1992).

Defendants contend that the mask's alleged propensity to fog cannot, as a matter of law, be the proximate cause of Hill's injury because Hill's decision to play paintball at dusk and his decision to remove the mask during the game constitute intervening, superseding causes of his injury. They assert, without supporting citation, that the prohibition on removing one's mask is the cardinal rule of paintball safety. And they note Hill's admissions that he was aware of the importance of wearing a protective mask during a paintball game and that the lack of light at the time of his injury made it difficult to see, apart from the fogginess of the mask. Thus, defendants argue, the fogging of Hill's mask was merely a condition, and not the cause, of his injury. They compare his case to *Rodriguez v. Glock, Inc.*, 28 F. Supp. 2d 1064, 1071–73 (N.D. Ill. 1998), in which a court granted summary judgment for the gun manufacturer defendant because a third party's reckless pointing of a gun at the plaintiff constituted a superseding cause

of the plaintiff's gunshot injury, regardless of any defect present in the gun. The court in *Rodriguez* ruled that the gun's alleged defect was merely a condition as opposed to a cause of the plaintiff's injury because the struggle involving the plaintiff in which the gun was pointed at the plaintiff was "so improbable and unforeseeable that it removed any potential liability from [the manufacturer.]" *Id.* at 1073.

Hill, however, points to a useful example of a case in which an Illinois court found that the proximate cause element had been satisfied even though the subject product's alleged defect did not immediately cause the plaintiff's injury. *See Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 669 N.E.2d 608 (1996). In *Mack*, a fuel shut-off device disabled a plaintiff's automobile after a collision, which led one of the plaintiffs to exit his car on a highway and seek help from others, one of whom was struck and killed. The court concluded that the allegedly defective shut-off device was a cause of the plaintiff's injury, not merely a condition, because even though a number of events occurred between the activation of the shut-off device and the injury, each event was foreseeable to the automobile manufacturer. *Id.* at 58–59, 669 N.E.2d at 614.

Viewing the evidence in the light most favorable to Hill, the Court cannot conclude that Hill's actions were so improbable that they constitute superseding causes of his injury. Because of the foreseeability of the type of injury Hill suffered, this case more closely resembles *Mack* than *Rodriguez*. Although Hill testified that the lack of light made it difficult to see at the time of his injury, he also asserts that it was primarily the mask's fogging that made it difficult for him to see. Based on Hill's assertion, a reasonable jury could find it foreseeable that a paintball player might remove his mask, despite a prohibition on doing so, if it became so fogged that the player could no longer

see. Walking around during a paintball game while unable to see, after all, carries its own risks. Similarly, a reasonable jury could find it foreseeable that someone would use the mask to play paintball up until the time when the sun set or that the mask might otherwise be used in conditions with subpar lighting. Hill's actions were not "so improbable and unforeseeable" that defendants should be excused as a matter of law from all liability for the alleged defect in their mask.

Defendants also argue that the length of time between the manufacturing of Hill's mask and his injury, as well as the wear and tear on the mask, preclude a finding that any defect in the mask's *design* was the proximate cause of his injury. According to defendants, because the fog-resistant coating could have been degraded over time—especially given the undisputed fact that the mask was covered in paint, dirt, and debris at the time of Hill's injury—it would be speculation for a jury to find that the mask's design, rather than mere wear and tear over time, caused the mask to fog. This argument, however, is at odds with Babcock's findings. Babcock concedes that the mask was manufactured years ago, was covered with foreign substances, and could have seen its anti-fog coating degrade over the years. Yet he maintains his opinion, based on his knowledge of the chemical properties of the coatings on the mask and his own testing, that it was the mask's design that caused it to fog at a higher degree than other masks. Thus, viewing the evidence in the light most favorable to Hill, the Court concludes that a jury could credit Babcock's testimony and determine that it was the mask's design—rather than wear and tear—that proximately caused the mask's fogging and Hill's injury.

**Conclusion**

For the reasons stated above, the Court denies defendants' motion for sanctions [dkt. no. 45], as well as their motion for summary judgment and exclusion of expert testimony [dkt. no. 58]. The case is set for a status hearing on September 6, 2016 at 9:00 a.m. for the purpose of discussing the possibility of settlement. Counsel for both sides are to jointly call chambers for the status hearing.

Date:  August 29, 2016

_____
MATTHEW F. KENNELLY
United States District Judge